UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVE SHAYA,

                  Plaintiffs,                  Civil Action No. 14-11112
                                                Honorable Matthew F. Leitman
v.                                         Magistrate Judge David R. Grand

DAVID BELCASTRO, et al.,

                  Defendants.

_____/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT [103, 104, 105]**

Before the Court are the motions for summary judgment filed by defendants Maxwell Garbarino [103], Kyle Tertzag [104], and the remaining "City of Hamtramck defendants," comprised of the City of Hamtramck (the "City"), Adam Tardif, Andy Mileski, Erik Tungate, Andrea Karpinski, Lydia Mackiewicz, and Christine Akins (all collectively the "defendants")[1] [105].   Plaintiff Steve Shaya filed a response to each of the motions [121, 122, 123] and defendants filed their respective replies [114, 115, 116].   The motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). [106].   The Court conducted a hearing on the motions on February 3, 2016.[2]

_____

[1] In a November 20, 2014 order, Judge Leitman dismissed all of Shaya's claims against David Belcastro. [58].  Neither party moved to amend the caption to reflect his dismissal from this case.

[2] During the February 3, 2016 hearing, Shaya stipulated to the dismissal of the following claims against the following defendants: (1) Freedom of Information Act – the City (Count IV); (2) Invasion of Privacy – Tardif (Count IX); (3) ELCRA – Karpinski (Count XVIII); (4) First Amendment Retaliation – Karpinski (Count XXI); (5) Michigan State Constitution – Karpinski (Count XXII); (6) 42 U.S.C. § 1983 – the City (Count XXVII).

   In an order dated September 11, 2015 [98], the parties also stipulated to the dismissal with prejudice of the following claims against the following defendants: (7) Abuse of Process –

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that defendants' motions for summary judgment [**103, 104, 105**] be **GRANTED**.

## II.     REPORT

### A.      Background

In October 2011, the City hired Steve Shaya ("Shaya") as an independent contractor to lead its Department of Public Services ("DPS") as "Interim Director." [105, Ex. 21].  The City employed him as the full-time Director of DPS beginning in February 2012. [48, Ex. 2].  Shaya worked in this capacity for approximately two and a half years, until September 2014, when he was terminated by the City's Emergency Manager, Cathy Square. [112, Ex. W at 794].  During his employment at DPS, Shaya maintains that members of the City's police department, its administration, and his own subordinates at DPS, engaged in tortious conduct and subjected him to various forms of discrimination, harassment, and retaliation in violation of federal and state law.  The Court will address the specific allegations against each of the defendants below.

### B.      Relevant Facts

#### 1.      *Shaya's Allegations against Chief of Police Maxwell Garbarino*

On November 15, 2013, Shaya allegedly left his DPS office at around noon and travelled home for lunch in his City-owned vehicle, a 2008 Chevrolet Blazer. [48 at ¶¶ 42-43].  He claims that he returned to his office around 1:00 p.m. without incident. [*Id.* at ¶ 42.].  At approximately

---

Tardif, Mileski, and the City (Count III); (8) Defamation – Tardif (Count VIII); (9) Defamation – Karpinski (Count XIX); (10) Trespass – Karpinski (Count XX); and (11) Defamation – Mackiewicz (Count XXVI).

12:36 p.m., David Belcastro ("Belcastro"), a retired Detroit police officer, called a 911 City dispatcher reporting that he had been involved in a hit-and-run accident with a sports-utility vehicle matching the description and plate number of Shaya's City-owned vehicle. [*Id.* at ¶¶ 44-45]. Shaya asserts that later that same day, Sergeant Adam Tardif ("Tardif") approached him at his DPS office and questioned him in a "discourteous and hostile" manner about the accident. [*Id.* at ¶ 46]. Shaya denied any involvement in the accident and sent an e-mail to the City's Chief of Police, Maxwell Garbarino ("Garbarino"), maintaining his innocence. [*Id.* at ¶ 46, 49]. On November 18, 2013, Shaya met with Garbarino and informed him that members of the City's police department had fabricated his involvement in the accident. [*Id.* at ¶ 51]. According to Shaya, Garbarino never investigated these allegations of police misconduct and later made "derisive comments" about Shaya's Chaldean ethnicity. [*Id.* at ¶¶ 70(A), 108(A)].

Based on the above conduct, Shaya asserts four claims against Garbarino: (1) public services discrimination under the Elliot-Larsen Civil Rights Act, M.C.L. 37.2101, et seq. ("ELCRA") [*id.* at ¶ 108(A)]; (2) intentional infliction of emotional distress ("IIED") [*id.* at ¶ 111]; (3) First Amendment retaliation [*id.* at ¶ 168]; and (4) violations of Article I, Sections II (equal protection), III (assembly), V (free speech), and XVIII (self-incrimination) of the Michigan State Constitution. [*Id.* at ¶ 174].

### 2.    *Shaya's Allegations against City Manager Kyle Tertzag*

In August 2012, the City hired Kyle Tertzag as its City Manager, where he remained until July 2013. Shaya maintains that Tertzag engaged in a pattern of misconduct over the course of the spring and summer of 2013, including:

3

- Selectively targeting minority-owned businesses for signage ordinance violations until Shaya reported him to City Councilman Anam Miah. [48 at ¶¶ 147-49].

- Violating the General Purchasing Policies ordinance. [*Id.* at ¶ 158(C)].

- Improperly diverting Public Act 51 funds to the City's general payroll obligations. [*Id.* at ¶ 158(E)].[3]

- "[T]rying to illegally seek funding for a cricket field that was to be a gift to the City from Audia Construction but, in reality, Tertzag was trying to get Audia Construction reimbursed from the [Public Act 51 funds.]" [*Id.* at ¶ 158(D)].

- Interfering with Shaya's attempt to stop an illegal demolition at 3900 Christopher Street in Hamtramck "without proper permit documentation." [*Id.* at ¶ 208]. Shaya further alleges that Tertzag wanted the demolition to proceed because his acquaintance, City Councilman Tom Jankowski, owned the demolition company.

- After Shaya reported this conduct to City officials, Tertzag placed a reprimand in his personnel file based on false allegations that Shaya ordered DPS employees to illegally dump building debris in a City-owned lot. [*Id.* at ¶¶ 151-54].

In view of the foregoing, Shaya asserts three claims against Tertzag: (1) discrimination and retaliation under the ELCRA [*id.* at ¶¶ 147-48, 151, 154]; (2) First Amendment retaliation [*id.* at ¶¶ 157-63, 206-12]; and (3) violations of Article I, Sections II (equal protection), III (assembly), V (free speech), and XVIII (self-incrimination) of the Michigan State Constitution. [*Id.* at ¶¶ 165, 216].

---

[3] Public Act 51 "governs state appropriations for most Michigan transportation programs . . . [t]he effect of [Public Act 51] . . . is to allocate state restricted transportation revenue between highway programs and public transportation programs, and highway program funds between [the Michigan Department of Transportation] and local road agencies. William E. Hamilton, House Fiscal Agency, Act 51 Primer: A Guide to 1951 Public Act 51 and Michigan Transportation Funding 1 (2007).

### 3. Shaya's Allegations against Acting City Manager Erik Tungate

In March 2012, the City hired Erik Tungate ("Tungate") as its Acting City Manager, where he remained until July 2012. During this time, Shaya maintains that Tungate engaged in a pattern of misconduct, including:

- Using the word "crap" in an e-mail after he learned about the purchase of a building for the purpose of constructing a Bangladeshi Islamic Center. [48 at ¶ 126].

- Condoning the denial of public services to minority residents, *e.g.*, tree-trimming, de-rooting, and sidewalk repair. [*Id.* at ¶127].

- Allowing politically influential Arab and Bengali City residents to be selectively targeted for building code violations. [*Id.* at ¶¶128-29].

- After Shaya reported this conduct to City officials, Tungate issued him a reprimand, placed him on a 90-day probationary period, and ordered him to produce his professional licenses, and college transcripts to verify his employment qualifications. [*Id.* at ¶ 132]. At this time, Tungate allegedly told Shaya, "I know how you Chaldeans operate." [*Id.*].

Based on the above conduct, Shaya asserts three claims against Tungate: (1) retaliation, discrimination, and public services discrimination under the ELCRA [*id.* at ¶ 123-35]; (2) First Amendment retaliation [*id.* at ¶ 136-42]; and (3) violations of Article I, Sections II (equal protection), III (assembly), V (free speech), and XVIII (self-incrimination) of the Michigan State Constitution. [*Id.* at ¶¶ 143-45].

### 4. Shaya's Allegations against Sergeants Adam Tardif and Andy Mileski

The following are the salient facts underlying Shaya's allegations against City police Sergeants Tardif and Andy Mileski ("Mileski"):

- In December 2011, while he was still an independent contractor, Shaya reported Tardif to City officials for allegedly "undertaking simultaneous employment" with a City contractor in violation of the City's ethics ordinance. [48 at ¶ 17].

5

- On account of these disclosures, Tardif was forced to disclose his dual employment to the City Council. [*Id.* at ¶ 20].

- After Shaya became the full-time Director of DPS in February 2012, he reported Tardif to City officials for allegedly "operating a towing business." The towing business allegedly billed the City police department's "drug forfeiture fund" for its towing services in violation of the City's ethics ordinance. [*Id.* at ¶ 22].

- Because of Shaya's disclosures, "the City of Hamtramck took remedial measures to ensure that . . . Tardif would not conduct any further unauthorized towing operations on behalf of the City of Hamtramck." [*Id.* at ¶ 24].

- On October 26, 2013, Shaya discovered that that taillight of his City-owned vehicle had been broken. When the police department investigated the incident, Tardif allegedly "barged" into Shaya's DPS office and "rudely and loudly accused him of damaging city property without reporting it . . . this confrontation was done by Tardif in front of members of the public as well as staff employees [Shaya] supervised." [*Id.* at ¶ 38].

- During the police investigation of the November 15, 2013 hit-and-run accident (discussed above), Tardif entered Shaya's DPS office and "in full view and earshot of both members of the public and [DPS] staff subordinates, began discourteous and hostile interrogation regarding [Shaya's] possible involvement" in the accident. [*Id.* at ¶ 46].

- On November 18, 2013, Tardif was removed from the police investigation and Chief Garbarino informed Shaya that Mileski would be leading the investigation. [*Id.* at ¶¶ 52-55].

- Both Tardif and Mileski issued police reports that contained significant discrepancies with Belcastro's 911 recording and the physical damage to Shaya's City-owned vehicle. [*Id.* at ¶¶ 60-61].

- On December 11, 2013, Mileski served Shaya with a misdemeanor appearance ticket for leaving the scene of an accident. [*Id.* at ¶¶ 63, 66, 68; *see* 105, Ex. 36].

- On December 17, 2013, District Judge Paul J. Paruk dismissed the ticket without providing any notice of a hearing to Shaya or his attorney. [*Id.* at ¶ 69].

- Thereafter, Tardif "interfer[ed] with [Shaya's] ability to function at his employment by, among other things, failing to report water main break[s] for hours, confiscating his photo identification, breaking into his City-issued vehicle, trespassing at his residence to photograph his vehicle." [*Id.* at ¶ 81(D)]. He also

6

allegedly made "repeated derogatory and offensive remarks regarding [Shaya's] Iraqi Chaldean national origin and religion." [*Id.* at ¶ 81(C)].

Based on the above conduct, Shaya asserts the following claims: (1) violations of Michigan's Whistleblower Protection Act, M.C.L. § 15.361 *et seq.* ("WPA") (Tardif and the City) [*id.* at ¶¶ 76-84]; (2) malicious prosecution (Tardif, Mileski, and the City) [*id.* at ¶¶ 85-91]; (3) First Amendment retaliation (Tardif and Mileski) [*id.* at ¶ 167-72]; (4) violations of Article I, Sections II (equal protection), III (assembly), V (free speech), and XVIII (self-incrimination) of the Michigan State Constitution (Tardif and Mileski). [*Id.* at ¶¶ 173-75].

### 5. *Shaya's Allegations against Water Department Officials Cheryl Karpinski and Lydia Mackiewicz*

Regarding the City's Water Department Director, Cheryl Karpinski ("Karpinski") and one of its employees, Lydia Mackiewicz ("Mackiewicz"), Shaya alleges that:

- He reported Karpinski to Emergency Manager Square for water billing fraud. [48 at ¶ 219].

- Mackiewicz, Karpinski's "close friend," retaliated against him by terminating the water service to his sister's Hamtramck residence. [111, ¶ 7 at Pg ID 2227; 48 at ¶ 220].

- Shaya reported the retaliatory conduct to the City's Human Resources Director, Margaret Scanio, but she failed to remedy the situation. [*Id.* at ¶ 222].

Based on the above conduct, Shaya asserts that the City, Karpinski, and Mackiewicz violated the WPA. [*Id.* at ¶ 218-222].

7

###### 6.   *Garbarino's Motion for Summary Judgment*

In his motion for summary judgment,[4] Garbarino argues that: (1) there is no evidence in the record that he deprived Shaya of a public service under the ELCRA by failing to investigate whether Tardif and Mileski fabricated Shaya's involvement in the hit-and-run accident; (2) the IIED claim lacks merit because he never subjected Shaya to "extreme and outrageous" behavior and there is no evidence that Shaya suffered from "severe emotional distress"; (3) the First Amendment retaliation claim should be dismissed because he was not Shaya's supervisor and he had no authority to terminate Shaya's employment with the City; (4) the state and federal claims are respectively barred under the doctrines of governmental and qualified immunity; and (5) Michigan law does not recognize an independent damages remedy against individual government employees for violations of the Michigan State Constitution.

###### 7.   *Tertzag's Motion for Summary Judgment*

In his motion for summary judgment, Tertzag contends that: (1) the ELRCA discrimination and retaliation claims lack merit because Shaya cannot prove that he suffered an adverse employment action; (2) the ELCRA discrimination claim should be dismissed because Shaya was not qualified for the position of DPS director; (3) the First Amendment retaliation claim fails because Shaya never engaged in a protected activity or suffered an adverse employment action; (4) there is no independent damages remedy against individual government

---

[4] Garbarino's motion seeks summary judgment under Fed. R. Civ. P. 56 and, in the alternative, judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). The Court will consider Garbarino's motion solely as one for summary judgment since he submitted material "outside the pleadings." Fed. R. Civ. P. 12(d); *see also Stoudemire v. Mich. Dep't of Corr.*, 614 F. App'x 798, 805 n.2 (6th Cir. 2015). The Court will afford the same treatment to Tertzag's motion for summary judgment.

employees for violations of the Michigan State Constitution; (5) Shaya's state and federal claims are respectively barred under the doctrines of governmental and qualified immunity.

### 8.    *City of Hamtramck Defendants' Motion for Summary Judgment*

In their motion for summary judgment, the City of Hamtramck defendants assert that: (1) the ELCRA retaliation claim against Tungate lacks merit because Shaya's informal complaints about discrimination against minority residents is not a protected activity, Shaya's probation is not an adverse employment action, Tungate was unaware of Shaya's complaints, and Shaya cannot show that Tungate placed him on probation for pretextual reasons; (2) the First Amendment retaliation claim against Tungate should be dismissed because Shaya's informal complaints about discrimination against minority residents is not a protected activity, Shaya's probation is not an adverse employment action, and Shaya's informal complaints were not a motivating factor for the probation; (3) the WPA claim against Tardif should be dismissed because Shaya was an independent contractor at the time he allegedly reported Tardif's dual employment to City officials, Shaya's complaints that Tardif was "rude and discourteous" during the hit-and-run investigation are not protected by the WPA, Shaya did not suffer an adverse employment action, there is no causal connection between Shaya's complaints and any adverse employment action, and Shaya cannot show that Tardif's investigation of the hit-and-run accident was pretextual; (4) the WPA claim against Karpinski and Mackiewicz should be dismissed because Shaya unknowingly passed along information about Karpinski's water-billing fraud to Emergency Manager Square, Shaya cannot prove that the termination of water service at his sister's residence actually occurred, in any event such conduct is not an adverse employment action under the statute, there is no evidence of a causal connection between the protected

9

activity and the alleged adverse action, and Shaya cannot demonstrate that the termination of water service was pretextual; (5) the City cannot be held vicariously liable for the ELCRA claims against Garbarino, Tertzag, and Tungate since the individual ELCRA claims against those defendants lack merit; (6) Tardif, Mileski, and the City are entitled to summary judgment on the malicious prosecution claim because Mileski had probable cause to issue the misdemeanor appearance ticket, Tardif never commenced any criminal proceeding against Shaya, and the City cannot be held vicariously liable where the claims against the individual defendants lack merit; (7) the First Amendment retaliation claim against Tardif and Mileski should be dismissed because Shaya's informal complaints about Tardif's dual employment does not qualify as a protected activity, Shaya did not present evidence that Tardif was responsible for any adverse action against him, Mileski had probable cause for issuing the misdemeanor citation, and there is nothing in the record showing that either Tardif or Mileski knew about Shaya's reporting activities; (8) the IIED claim against all of the City of Hamtramck defendants fails to satisfy the minimum pleading requirements under Fed. R. Civ. P. 8(a), the claim should be dismissed because none the City of Hamtramck defendants exhibited extreme and outrageous conduct towards Shaya, and there is no evidence that Shaya suffered from severe emotional distress; (9) Michigan law does not recognize an independent damages remedy against individual government employees for violations of the Michigan State Constitution; and (10) Shaya's state and federal claims are respectively barred under the doctrines of governmental and qualified immunity.

### C.     Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

11

D.     **Analysis**

1.     *ELCRA Claim – Chief Garbarino (Count VI)*

Shaya alleges that Chief Garbarino violated the ELCRA by denying him "the full and equal enjoyment of public services because of religion, race, color and/or national origin and association with such protected groups" when Garbarino engaged in "unwelcome harassment" and "unlawful bias" by using "ethnic slurs" and failing "to adequately investigate [Shaya's] claims of police harassment." [*Id.* at ¶ 108(A)].

Section 37.2302(a) of the ELCRA provides that, "a person shall not: (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or *public service* because of religion, race, color, national origin, age, sex, or marital status." (Emphasis added).  To state a claim under Section 37.2302(a), an ELCRA plaintiff must establish four elements: (1) discrimination based on a protected characteristic; (2) by a person; (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations; (4) of a public service.[5] *Cf. Haynes v. Neshewat*, 477 Mich. 29, 35 (2007) (discussing public accommodations discrimination).

Assuming a police department investigation into allegations of individual police officer misconduct is a "service" provided by the City's police department, Shaya does not proffer any

_____

[5] The City's police department is a "public service" as defined by Mich. Comp. Laws § 37.2301(b) (defining the term "public service" as "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof . . . established to provide service to the public . . ."). *See Diamond v. Witherspoon*, 265 Mich. App. 673, 687 (2005) (holding that a complaint sufficiently alleged that "plaintiffs were denied public services" when a City of Detroit police officer engaged in sexual harassment during traffic stops).

12

evidence that Chief Garbarino failed to investigate whether Tardif and Sergeant Andy Mileski ("Mileski") fabricated Shaya's involvement in the hit-and-run accident or that Chief Garbarino declined to follow standard operating procedures in deciding whether to initiate an internal police investigation.   To that end, he failed to rebut Mileski's testimony that Garbarino personally assigned him to investigate the circumstances of the hit-and-run accident, that he evaluated the evidence in the case (including Belcastro's 911 call), and that he eventually requested that the misdemeanor appearance ticket issued to Shaya be dismissed. [103, Ex. 5 at 23-24, 54].   Moreover, Shaya expressly admitted that he does not know whether Garbarino actually failed to investigate his allegations that Tardif and Mileski had framed him for the hit-and-run accident. [*Id.*, Ex. 1 at 499 ("A.  I don't know what he did…It didn't look like anything was done.  Q.  Okay.  If you don't know what he did, how do you know he failed to investigate?  Okay, then I don't know.")].[6]

For the first time in his response, Shaya counters that his ELCRA claim is "a hostile work environment case as well as a denial of public service case." [123 at 25].  This theory of liability is equally unavailing.  To establish an ELCRA hostile work environment claim, a plaintiff must show that he: "(1) belong[s] to a protected group; (2) was subjected to communication or conduct on the basis of a protected classification; (3) the communication or conduct was unwelcome; (4) the unwelcome communication or conduct substantially interfered with his

---

[6] Garbarino mistakenly contends that the ELCRA claim against him should be dismissed because Shaya failed to demonstrate that he suffered an adverse employment action [103 at 12-13].  An ELCRA public service discrimination claim does not require proof of an adverse employment action because "the plain language of the [EL]CRA includes situations outside the realm of employment where an individual's access to public accommodations or public services is affected." *Witherspoon*, 265 Mich. App. at 685.

employment so as to create an intimidating, hostile, or offensive work environment; and (5) respondeat superior." *Bidasaria v. Cent. Mich. Univ.*, No. 10-15079, 2012 U.S. Dist. LEXIS 18787, at *23 (E.D. Mich. Feb. 15, 2012) (citing *Chambers v. Trettco*, 463 Mich. 297, 311 (2000)).

Shaya asserts that Garbarino created a hostile work environment by: (1) failing to investigate whether Tardif and Mileski framed him for the hit-and-run accident; (2) using ethnic slurs; and (3) failing to report water main breaks to DPS. [*Id.* at 26; 48 at ¶ 108(A)]. None of these arguments are persuasive. With respect to his first argument, the Court has already noted that Shaya has not come forward with any evidence to support his "failure to investigate" claim. Regarding his second argument, which the Court will more fully address in its discussion of the IIED claim, Shaya recounts a total of four incidents during his tenure with the City where Garbarino allegedly made a derogatory comment about his Chaldean ethnicity. Even if these allegations are true, they cannot form the basis of a hostile work environment claim since "the sporadic use of abusive language . . . is not actionable." *Douglas v. Ford Motor Co.*, No. 306231, 2013 Mich. App. LEXIS 995, at *8 (Mich. Ct. App. Jun. 6, 2013) (quotation omitted); *see also Bidasaria*, 2012 U.S. Dist. LEXIS 18787, at *24 ("Even when rude comments are alleged with regard to a plaintiff's protected characteristic . . . isolated incidents of alleged rude or boorish behavior are not sufficient to establish a hostile work environment claim . . ."); *Handlon v. Rite Aid Servs., LLC*, No. 10-13710, 2012 U.S. Dist. LEXIS 15359, at *24 (E.D. Mich. Feb. 8, 2012) (holding that two incidents where co-worker inquired about the race of plaintiff's children and another where co-worker called plaintiff "ghetto" did not establish a racially hostile work environment).

14

As for his third argument, Shaya's conclusory statement that, "Garbarino was deliberately indifferent investigating claims of harassment by Tardif in not promptly reporting information at emergencies involving the public works department," and that "this deliberate indifference . . . was motivated by the aforesaid discriminatory unanimous [*sic*]," fails to adequately establish that Garbarino, or other members of the police department, intentionally concealed the water main breaks from DPS on account of Shaya's national origin. [123, ¶ 31 at Pg ID 4091]. Nor does Shaya proffer any evidence to rebut Garbarino's deposition testimony where he denied directing his officers to conceal reported water main breaks from DPS or failing to investigate whether members of the police department had engaged in such conduct. [112, Ex. R at 82-83; *see* 123 at 35, ¶ 31]. Therefore, Shaya's ELCRA public service discrimination and hostile work environment claims cannot survive summary judgment.

### 2.   *IIED Claim – Garbarino (Count VII)*

With respect to his IIED claim, Shaya relies on the same allegations from his ELCRA claim against Garbarino and maintains that, "[b]y virtue of the acts pled above, each defendant [including Garbarino] has committed intentional and outrageous acts targeted to deny plaintiff his constitutional rights and were calculated to induce severe emotional, mentally and physical trauma to plaintiff . . ." [48 at ¶ 111].

An IIED claim under Michigan law requires proof of: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985). The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Smith v. Calvary*

15

*Christian Church*, 233 Mich. App. 96, 113 (quoting *Haverbush v. Powelson*, 217 Mich. App. 228, 234 (1996)).  "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not enough to support a viable claim. *Roberts*, 422 Mich. at 603 (quoting Restatement Torts, 2d, § 46, comment d, pp. 72-73); *see also Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993). "In reviewing such a claim, it is initially for the court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery."  *Hammer v. Bill Knapp's Michigan, Inc.*, No. 212837, 2000 Mich. App. LEXIS 2086, at *7 (Mich. Ct. App. Mar. 3, 2000) (citing *Doe v. Mills*, 212 Mich. App. 73, 92 (1995)).

> In his sworn affidavit, Shaya avers that:

> > (A) Chief Max Garbarino ma[de] ongoing derisive comments relative to my Chaldean identity; Garbarino had in the documents 2013 [*sic*] indicated "I'm watching you Chaldean boy," and . . . in early "November of 2013, the Chief made the same comment . . .

> > (B) [I]n December of 2013, Police Chief Garbarino was in front [of] the hallway at city Hall and stated "you know how those Chaldeans are" . . .

> > (C) On February 6, 2014, Garbarino said near the front driveway in city Hall, "I am watching you, Chaldean boy."

[121, ¶ 28 at Pg ID 4007].  Garbarino denies he ever made these comments. [112, Ex. R at 101]. While these alleged remarks are clearly reprehensible and offensive, even assuming Garbarino actually made them, they do not reflect the level of extreme and outrageous behavior that is actionable under Michigan law, especially considering Garbarino's lack of authority over Shaya (they supervised different City agencies), their respective ages (both are adults), and the isolated nature of the remarks. *See e.g., Lindsey v. St. John Health Sys.*, Nos. 268296, 270042, 2007

16

Mich. App. LEXIS 268, at *5-6 (Mich. Ct. App. Feb. 6, 2007) (holding that intentional infliction of emotional distress claim was properly dismissed where "two derogatory comments or epithets" were directed at the plaintiff); *Mayville v. Ford Motor Co.*, No. 267552, 2006 Mich. App. LEXIS 3226, at *16-17 (Mich. Ct. App. Oct. 26, 2006) (upholding the dismissal of intentional infliction of emotional distress claim where supervisor called plaintiff a "white bitch"); *Graham v. Ford*, 237 Mich. App. 670, 675 (1999) (racial insults from supervisor not actionable); *Meek v. Mich. Bell Tel. Co.*, 193 Mich. App. 340, 346 (1992) (ethnic insults from supervisor not actionable); *Trudeau v. Fisher Body Div., General Motors Corp.*, 168 Mich. App. 14, 20 (1988) (racially charged sexual overtures from supervisor not actionable). Accordingly, Shaya's IIED claim against Garbarino should be dismissed.[7]

### 3.    First Amendment Retaliation Claim – Garbarino (Count XVI)

Shaya contends that Garbarino violated his First Amendment rights by initiating the hit-and-run investigation and then directing Mileski to file a misdemeanor appearance ticket against him after he allegedly reported "police violations of the Ethics Chapter of City of Hamtramck ordinances" to City Manager Bill Cooper. [48 at ¶ 168, 170; 121, ¶ 9 at Pg ID at 4004].

To establish a claim for First Amendment retaliation, a plaintiff must show that: (1) he engaged in constitutionally protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between the protected conduct and the adverse action–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See Kennedy v.*

---

[7] Because the Court concludes that Shaya's IIED claim is without merit, it need not evaluate whether Garbarino is entitled to governmental immunity under Michigan law. *See Dean v. Lentine*, No. 08-14181, 2010 U.S. Dist. LEXIS 7843, at *18-19 n.2 (E.D. Mich. Feb. 1, 2010).

*City of Villa Hills, Ky.*, 635 F.3d 210, 217 (6th Cir. 2011) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). "[A] 'motivating factor' is essentially but-for cause – 'without which the action being challenged simply would not have been taken.'" *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (quoting *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). Once the plaintiff has satisfied this burden, if the defendant can show that the same action would have been taken in the absence of the protected conduct, the defendant is entitled to prevail on summary judgment. *See Neal v. Nowack*, No. 09-12859, 2010 U.S. Dist. LEXIS 85306, at *12 (E.D. Mich. Jul. 9, 2010) (citing *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001)).

As a public employee, Shaya "must make additional showings to demonstrate that [his] conduct was protected," *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), by demonstrating that: (1) his speech involved matters of public concern; and (2) his interest "in commenting upon matters of public concern" outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)).

Assuming Shaya engaged in protected conduct by reporting police officers for violations of the City's ethics ordinances, and that the hit-and-run investigation and the issuance of the misdemeanor appearance ticket amount to an adverse action, Shaya fails to adduce any proof of causation, *i.e.*, that Garbarino knew that Shaya reported the officers to City Manager Bill Cooper and acted on that knowledge. [*See* 121, ¶¶ 8-9 at Pg ID 4004].

While Shaya attempts to supplement this lack of evidence with the bare allegation that he "has pled unremedied acts of retaliation as an 'adverse action' which is recognized under *Meyer*

18

[*v. City of Center Line*]," [123 at 28], he does not elaborate on the import of this case or how it may substitute for admissible evidence of causation. *See Kitchen v. Heyns*, No. 14-12883, 2015 U.S. Dist. LEXIS 176087, at *13-14 (E.D. Mich. Nov. 30, 2015) (recommending the dismissal of First Amendment retaliation claim where plaintiff could not produce any evidence of causation); *see also Neal*, 2010 U.S. Dist. LEXIS 85306, at *13 ("Bare allegations by the plaintiff of malice on the part of a defendant are not enough to establish retaliation claims."). Since Shaya has not established a genuine issue of material fact as to the element of causation, Garbarino is entitled to summary judgment on his First Amendment retaliation claim.[8][9]

### 4.    *Michigan State Constitutional Claims – Garbarino (Count XVII)*

Shaya maintains that Garbarino violated several provisions of the Michigan State Constitution because he failed to investigate whether Tardif and Mileski fabricated his involvement in the hit-and-run accident.  Without supplying any detailed factual allegations, Shaya's complaint merely states that Garbarino's conduct violated Article I, Sections II (equal protection), III (assembly), V (free speech) and XVIII (self-incrimination, fair treatment at investigations). [48 at ¶ 174].

---

[8] The Court need not consider Garbarino's alternative argument that he is entitled to qualified immunity since Shaya "failed to establish a prima facie case of a violation of a constitutional right . . ." *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010).

[9] Because Garbarino construes Shaya's First Amendment retaliation claim as arising out of the employment context, he urges the Court to dismiss this cause of action on the ground that he never supervised Shaya and that he had no authority to terminate him. [103 at 19-20].  This argument is misplaced since First Amendment retaliation claims are not exclusively confined to the realm of employment. *See e.g., Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015) (holding that parents of a child with special needs established viable claim of First Amendment retaliation where school officials allegedly filed child abuse charges after parents demanded that amendments be made to their child's individualized education plan).

The Michigan Supreme Court's opinion in *Jones v. Powell*, 462 Mich. 329, 337 (2000), makes clear that Garbarino is entitled to summary judgment on this claim.   In *Jones*, the Michigan Supreme Court held that there is no independent damages remedy against individual government employees for violations of the Michigan State Constitution.   Citing to its prior opinion in *Smith v. Dep't. of Public Health*, 428 Mich. 540 (1987), the Court recognized a claim for monetary damages under the state constitution only in a narrow category of cases where the State of Michigan is the party defendant and other remedies are generally unavailable because the state is immune from suit under the doctrine of sovereign immunity. *Id.*   The Court emphasized, however, that "those concerns are inapplicable" to actions such as this one, where an individual defendant is being sued, because "a plaintiff may bring an action against an individual defendant under [42 U.S.C.] § 1983 and common-law tort theories." *Id.*

Here, Shaya has several potential avenues for relief open to him besides the alleged state constitutional violations since he sued Garbarino in his individual capacity.   These remedies include damages under Section 1983 as well as state "common-law tort theories."   Indeed, as discussed herein, Shaya raises Section 1983 as the statutory basis for his First Amendment retaliation claim against Chief Garbarino, and asserts a claim for intentional infliction of emotional distress. [48 at ¶¶ 111, 167-72].   Therefore, in light of *Jones*, Shaya may not pursue damages against Garbarino on claims arising under the Michigan State Constitution.

### 5.     *ELCRA Claim – Tertzag (Count XIII)*

Shaya's ELCRA claim against Tertzag involves allegations of both retaliation and discrimination.   First, Shaya maintains that Tertzag placed an unwarranted reprimand in his personnel file because he reported Tertzag to City officials for selectively enforcing signage

ordinances against minority-owned businesses.   Second, Shaya contends that Tertzag's retaliatory conduct constitutes illegal "discrimination." [48 at ¶¶ 147-55].  Neither ELCRA claim has merit.

*a.      ELCRA Retaliation Claim*

To establish a prima facie case of ELCRA retaliation, a plaintiff must demonstrate: "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *DeFlaviis v Lord & Taylor, Inc.*, 223 Mich. App. 432, 436 (1997).  Once the plaintiff sets forth a prima facie case,

> the burden shifts to the defendant to articulate a legitimate business reason for the discharge.  If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge.

*Roulston v. Tendercare (Mich.), Inc.*, 239 Mich. App. 270, 281 (2000).

Tertzag only challenges whether the reprimand that he placed in Shaya's personnel file constitutes an adverse employment action, *i.e.*, the third element.  Tertzag cites to *Pena v. Ingham County Rd. Comm'n*, 255 Mich. App. 299, 311 (2003), which accurately defines an adverse employment action as:

> an employment decision that is materially adverse in that it is more than [a] mere inconvenience or an alteration of job responsibilities and that there must be some objective basis for demonstrating that the change is adverse because a plaintiff's subjective impressions as to the desirability of one position over another [are] not controlling.

(Internal quotation marks omitted).  Without providing an "exhaustive list" of what it considered to be adverse employment actions, the *Pena* court enumerated the following examples: "a

21

termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 312 (quoting *White v. Burlington Northern & Santa Fe Co.*, 310 F.3d 443, 450 (6th Cir. 2002). *See also*, *Chen v. Wayne State Univ.*, 284 Mich. App. 172, 202 (2009) (same).

Tertzag's reprimand letter does not fit within *Pena*'s definition of an adverse employment action, and lacks the concrete and material inherent consequences present in the types of adverse actions enumerated by that court. Indeed, Shaya himself acknowledged that the reprimand letter did not result in loss of compensation, job benefits, or demotion in title or position. [104, Ex. 1 at 510]. Under these circumstances, Shaya has failed to raise a material question of fact that the reprimand letter "does not constitute a materially adverse employment action because there was no consequence to or alteration of [Shaya's] pay, status, or responsibilities." *Anderson v. Ford Motor Co.*, No. 253090, 2005 Mich. App. LEXIS 1896, at *7 (Mich. Ct. App. Aug. 9, 2005); *see also Briggs v. Dep't. of Community Health*, No. 227725, 2002 Mich. App. LEXIS 1199, at *4 (Mich. Ct. App. Feb. 19, 2002) ("plaintiff's receipt of a reprimand, without further consequences, does not constitute a materially adverse employment action.").

Shaya counters that he suffered adverse employment actions other than the reprimand, including the removal of his code enforcement authority in September 2012, the reassignment of "inspector personnel" from DPS, and the hiring of City contractors without his knowledge or approval. [122 at 28; Ex. 1 at ¶¶ 26-30]. Shaya also alleges that Tertzag declined to take any remedial measures after he informed Tertzag that the City's Economic Development Director, Jason Friedman ("Friedman"), and Assistant City Manager Kathy Angerer ("Angerer") had

harassed him. [122, Ex. 1 at ¶ 30].  None of these allegations raise a genuine issue of material fact.

To begin with, Shaya fails to demonstrate that, as DPS Director, he ever lawfully possessed code enforcement powers, exercised supervisory authority over the reassigned "inspector personnel," or that the City's ordinance required Tertzag to obtain his approval before hiring City contractors.  Section 31.019 of the Hamtramck Code of Ordinances ("HCO") defines the contours of the DPS Director's authority.  That section provides that:

> (A) The Department of Public Services shall be headed by the Director of Public Services, who shall be responsible for all matters relating to the construction, management, maintenance and operation of the physical properties of the city, except as otherwise provided by this code.  The Director shall also be responsible for all planning in connection with changes or improvements to the physical properties which are essential to the future growth and development of the city.  Duties shall include responsibility for streets and signs, sanitation, sewer and water.

Hamtramck, Mich., Mun. Code § 31.019(A) (2007), *available at* http://library.amlegal.com/nxt/gateway.dll/Michigan/hamtramck_mi/titleiiiadministration/chapter31cityofficials?f=templates$fn=altmain-nf.htm$q=31.019%20$x=server$3.0#LPHit1 (last visited 6/7/16).  Absent from the DPS Director's responsibilities is any mention of "code enforcement," supervising "inspector personnel," or vetting City contractors.  In fact, the HCO specifically assigns code enforcement powers to a division within DPS that is separately headed by a "chief code enforcement official."  This official is responsible for "[a]ll construction permits, including those for building, electrical, plumbing, heating, sewer tapping, water tapping, sidewalk or driveway approach, street cutting and any other applicable permits required for work

23

to be done on private property or within the dedicated right-of-way or building setback line on major streets shall be issued by this division." Hamtramck, Mich., Mun. Code § 31.019(B)(2).

Insofar as the record shows that Shaya did, in fact, exercise code enforcement powers as DPS Director, he nonetheless concedes that Tertzag possessed the authority to transfer those responsibilities to another City department or agency.[10] [112, Ex. U at 268].  This authority is codified in the HCO and permits the city manager to "assign other duties and responsibilities to [DPS] as necessary for the operation of the city." Hamtramck, Mich., Mun. Code § 31.019(C). As a result, the alleged alteration or deprivation of Shaya's official responsibilities does not amount to an actionable adverse employment action because Shaya fails to demonstrate that he lawfully possessed those responsibilities in the first place, or that Tertzag lacked the authority to modify them.

As for the alleged harassment by Friedman and Angerer, Shaya alleges that:

> (A) Jason Friedman [made] false accusations to [the] Mayor that I was performing [my] job in unsatisfactory manner – I complained to Tertzag and Emergency Manager Cathy Square on various dates in 2013, but I know of no remedial action that was taken;
>
> (B) Jason Friedman made false reports that I distributed DPS stationary to Friedman to impersonate DPS section – [I] complained to Tertzag, who did nothing;
>
> (C) Jason Friedman accus[ed] me of not supervising work done by Platinum [Landscaping], implying a conflict of interest; this was done in Spring/Summer of 2013 and complaints were made to Tertzag and Square at various times in 2013 but no remedial action was taken at all regarding these complaints;
>
> . . .

---

[10] Although Shaya maintains that Tertzag further retaliated against him by removing him from the "sidewalk repair program" [112, Ex. V at 681], he admits that Tertzag also had the power to transfer that program to another City department or agency. [*Id.* at 472].

> (E) Jason Friedman falsely accused me of harassing city contractors this conduct was reported by Shaya to Tertzag in Summer of 2013;
>
> (F) Kathy Angerer, without requisite authority, gained access to my city-issue[d] computer in Spring of 2013 shortly after Tertzag and Friedman were confronted over the signage [enforcement] issue; this caused me to make a complaint to Councilperson Cathy Gordon, but no remedial action was taken, despite two attempts being made to enter [my] computer – the second being in the latter part of 2013.

[122, Ex. 1 at ¶ 30]. Shaya asserts that this "unremedied" pattern of harassment constitutes an adverse employment action under *Meyer v. City of Center Line*, 242 Mich. App. 560, 571 (2000), where the Michigan Court of Appeals held that "a supervisor's decision not to take action to stop harassment by co-workers in retaliation for an employee's opposition to a violation of the Civil Rights Act can constitute an adverse employment action." Shaya's argument is unavailing.

First, it is questionable whether *Meyer* even applies to the present case; Shaya provided no substantive analysis regarding whether the alleged harassment was "sufficiently severe" such that Tertzag's "failure to take action to respond . . . constitute[s] a materially adverse change in the conditions of employment." *Id.* Second, the more immediate problem for Shaya is that he does not sufficiently establish a causal link between Tertzag's alleged failure to remedy co-worker harassment and his own reports to City officials that Tertzag condoned the selective enforcement of the City's signage ordinances against minority-owned businesses.

"To establish causation, the plaintiff must show that his participation in activity protected by the [EL]CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett v. Kirtland Community College*, 245 Mich. App. 306, 315 (2001) (quoting *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). "Something more than a temporal connection between

protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *West v. General Motors Corp.*, 469 Mich. 177, 186 (2003).

Here, Shaya produces no admissible evidence that his disclosures to City officials played a "significant factor" in the alleged harassment. At best, he can only demonstrate that the harassment occurred after he reported Tertzag to City officials. This general "temporal connection" alone is not enough to establish the element of causation. *Id.*; *see also Marjaneh v. Bronson Battle Creek Hosp.*, No. 315121, 2014 Mich. App. LEXIS 1308, at *10-11 (Mich. Ct. App. Jul. 15, 2014). In addition, Shaya acknowledged that Tertzag had administrative rights to access his computer and e-mails and he failed to show that Angerer did not possess that authority as well. [112, Ex. W at 897, 957-58]. Consequently, Shaya failed to raise a material question of fact regarding his ELCRA retaliation claim against Tertzag, and that claim should be dismissed.

### b. ELCRA Discrimination Claim

Shaya's ELCRA discrimination claim against Tertzag also lacks merit. A cause of action for protected-class discrimination under the ELRCA may be supported with either direct or indirect evidence. *Powers v. Post-Newsweek Stations, Mich. Inc.*, 483 Mich. 986, 987 (2009). "Where the employee adduces direct evidence of bias, a plaintiff can go forward and prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case." *Id.* In the absence of direct evidence, the plaintiff must set forth a prima facie case of discrimination by establishing that: "1) the plaintiff was a member of a protected class, (2) the plaintiff was subject to an adverse employment action, (3) the plaintiff was qualified for the position, and (4) that others, similarly situated and outside the protected class, were unaffected by the employer's

26

adverse conduct." *Moralez v. Mich. State Univ. Bd. of Trs.*, Nos. 279792, 281440, 2009 Mich. App. LEXIS 1864, at *4 (Mich. Ct. App. Sep. 10, 2009) (citing *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 695 (1997)).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action. *Id.*  If the defendant produces such evidence, the burden then shifts back to the plaintiff to demonstrate that defendant's reasons are pretextual. *Id.*  This burden-shifting scheme is known as the *McDonnell Douglas* test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Because Shaya did not produce direct evidence of discrimination he must set forth a prima face case under the *McDonnell Douglas* test.   Applying this framework, Shaya's allegations do not establish his membership in a protected class, *i.e.*, the first prima facie element.  Shaya's position is that Tertzag "discriminated" against him because of his *reporting activities* to City officials, not *because of* his *race or national origin*.  [48 at ¶154 ("Tertzag … did retaliate and discriminate against [Shaya] *because [Shaya] opposed violations* of the [ELCRA].") (emphasis added)].  This argument fails as it mistakenly blurs the distinction between an ELCRA retaliation claim and an ELCRA discrimination claim–the former seeks to prevent a person from being retaliated against *because he engaged in protected conduct*, *i.e.*, reporting violations of the statute, while the later seeks to prevent a person from being discriminated against *because he is a member of a protected class*, *e.g.*, race, religion, or national origin.[11]  Thus, individuals who report ELCRA violations are only protected from employment "retaliation," M.C.L. § 37.2701(a), and they do not become a "protected class" in their own right

---

[11] M.C.L. § 37.2202(1)(a)-(b) prohibits employment discrimination on account of an individual's "religion, race, color, national origin, age, sex, height, weight, or marital status."

merely by alleging that the same retaliatory conduct doubles as a separate form of "discrimination."[12]   Accordingly, Shaya's assertion that he was "discriminated" against on account of his reporting activities, is insufficient to support an ELCRA discrimination claim and, for this reason, the cause of action should be dismissed.[13]

6.   *First Amendment Retaliation Claims– Tertzag (Counts XIV and XXIII)*

Shaya maintains that Tertzag's alleged retaliatory conduct sustains a claim for First Amendment retaliation where Shaya allegedly reported Tertzag to City officials for an array of misconduct beyond the selective enforcement of the signage ordinances, including violations of the City's General Purchasing Policies ordinance, the improper diversion of Public Act 51 funds, and facilitating illegal demolitions.[14] [48 at ¶¶ 147-49, 158, 206-12].

---

[12] Although the parties dispute whether Shaya was qualified to be DPS director, *i.e.*, the third prima facie element, the Court need not reach this issue because Shaya failed to establish that he belongs to a protected class for the purposes of his ELCRA discrimination claim against Tertzag. [104 at 19; 122 at 28].

[13] To the extent Tertzag invokes the doctrine of governmental immunity as a defense against Shaya's ELCRA claim, under Michigan law "[g]overnmental immunity is not a defense to a claim brought under the [EL]CRA." *Diamond v. Witherspoon*, 265 Mich. App. 673, 691 (2005); *see also Wells v. City of Grosse Pointe Farms*, 581 F. App'x 469, 478 (6th Cir. 2014) ("Michigan governmental immunity applies only to tort claims").

[14] Shaya testified at his deposition that Tertzag harassed him by sarcastically referring to him as a "Chaldean prince" on one occasion. [112, Ex. U at 327].  Tertzag denies that he ever made this comment. [124, Ex. LL at 119].  Whether or not this allegation is true, this alleged isolated remark does not qualify as an adverse action for purposes of First Amendment retaliation. *See Long v. Finch*, No. 14-13269, 2015 U.S. Dist. LEXIS 166851, at *8 (E.D. Mich. Jul. 24, 2015) *adopted by* 2015 U.S. Dist. LEXIS 49002 (E.D. Mich. Feb. 27, 2015) ("mere verbal harassment . . . does not amount to evidence of adverse action sufficient to establish a First Amendment retaliation claim"); *Hann v. Michigan*, No. 05-71374, 2007 U.S. Dist. LEXIS 27384, at *27 (E.D. Mich. Mar. 2, 2007) (same).

As discussed above, a prima facie case of First Amendment retaliation requires proof that: (1) Shaya engaged in constitutionally protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the protected conduct and the adverse action. *See Kennedy*, 635 F.3d at 217.  Tertzag argues that Shaya's reporting activities do not constitute protected speech, *i.e.*, the first element, and that he has failed to establish that he suffered an adverse employment action, *i.e.*, the second element. [104 at 20-21].  Ultimately, the Court does not have to reach either of these issues.

Assuming that Shaya's reporting activities qualify as protected speech, and that the alleged retaliatory conduct qualifies as an adverse action, Shaya still fails to sufficiently demonstrate a causal connection between them.  All Shaya can prove from the record is that Tertzag's placement of the reprimand in his personnel file, the hiring of City contractors without his approval, the reassignment of inspector personnel, and the "unremedied" harassment by Friedman and Angerer, all had some general temporal relationship with his reporting activities in the spring and summer of 2013. [122, ¶¶ 14, 27-30 at Pg IDs 4017, 4020-22].

In addition, Shaya attests in his sworn affidavit that:

> 20. In late June 2013 I told [City Councilmembers] Cathy Gordon, Hassan, Miah and Zwolak that a worker of Tom Jankowski's Empire Disposal was starting work without proper demolition permits; . . . I told these City Council members that legal requirements were not being met – Empire started demolition without a permit, did not verify ownership or utility disconnection, proof of insurance, or state builder's license, among other things.

> 21. I was later called into Acting City Manager Kyle Tertzag's office who was there with fellow [C]ity official Kathy Angerer; both screamed at me that [the] "outcome will not be good if [the] permit is not approved;"

> Tertzag and Angerer indicated that I would be fired if [the] matter does not get handled in a timely manner.

[*Id.*, ¶¶ 20-21 at Pg IDs 4018-19]. These statements do not supply the requisite causation to sustain Shaya's First Amendment retaliation claim. First, Shaya's affidavit omits any discussion regarding the temporal proximity between his conversation with Tertzag and his earlier reporting activities. Second, the affidavit fails to demonstrate that Tertzag knew about Shaya's reporting activities when he supposedly told Shaya that he would fire him if the permitting for the demolition was not handled expeditiously.[15] Shaya cannot ask the Court to simply infer

---

[15] Shaya additionally fails to establish a causal connection between his disclosure to City officials regarding the selective enforcement of the signage ordinances and Tertzag's alleged retaliatory conduct. At his deposition, Shaya testified that he initially reported the selective enforcement problem to Tertzag in the spring and summer of 2013, and that he privately raised the issue again with a group of City Councilmembers once Tertzag declined to take any remedial action. [112, Ex. V at 340-41, 381, 653-55]. Thereafter, Shaya claims that he attended a contentious meeting between Tertzag and the same group of City Councilmembers where the parties addressed the selective enforcement issue. Shaya does not assert that Tertzag learned of these reporting activities at the meeting or at any other time. [*Id.* at 657-59; Ex. W at 758-59].

Shaya's contention that Tertzag knew that he had reported him to City officials for misappropriating Public Act 51 funds is not supported by the record either. While Shaya initially testified that Tertzag was aware of his reporting activities regarding the Public Act 51 funds, Shaya later acknowledged that his testimony was not based upon his own personal knowledge, but rather information that he had allegedly obtained from City Councilmembers. [112, Ex. W at 796-97]. As a result, this portion of Shaya's deposition testimony is inadmissible and may not be used to demonstrate (or create a question of fact) that Tertzag knew about his reporting activities. *See Bernard v. Detroit Pub. Sch. Dist.*, No. 12-13992, 2015 U.S. Dist. LEXIS 59108, at *18-19 (E.D. Mich. May 6, 2015) (awarding summary judgment to defendant where plaintiff's deposition testimony revealed that he did not have personal knowledge of the relevant facts); *Flagg ex rel. J. B. v. City of Detroit*, 827 F. Supp. 2d 765, 775 (E.D. Mich. 2011) ("subjective beliefs, unbacked by facts within the personal knowledge of the witness, cannot assist Plaintiffs in withstanding summary judgment.").

For his part, Shaya avers in his sworn affidavit that:

30

causation from whatever general temporal proximity there may have been between his reporting activities and the alleged retaliatory conduct. *See e.g., Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) ("Substantial case law from this circuit cautions about the

---

> On or about June 6, 2013, I complained that a $34,000.00 change order was issued (and authorized by Tertzag) for de-rooting work in violation of the General Purchasing ordinance; this complaint was made to Councilpersons Gordon, Miah, Hassan, and Zwolak; **Tertzag retaliated by threatening to fire me if he learned how that [*sic*] I had sent a copy of the change order to City Council**.

[122, Ex. 1 at ¶ 22 (emphasis added)].   At first glance, Shaya's affidavit appears to create an issue of fact regarding whether Tertzag knew about Shaya's reporting activities.   But the problem for Shaya is that without establishing the factual context surrounding Tertzag's alleged comments, Shaya's vague assertion – that Tertzag threatened to fire him if he discovered that Shaya had reported him to City Council – does not provide the Court with the necessary information to conclude that Shaya actually heard Tertzag's comments first-hand, and that his assertion is based on personal knowledge, rather than on inadmissible hearsay.   Thus, "[a]lthough the statements are contained in an affidavit, they are ultimately inadmissible at trial as lacking in foundation and, therefore, insufficient to" demonstrate that Tertzag knew about Shaya's reporting activities. *Courtney v. Murphy*, No. 10-14123, 2012 U.S. Dist. LEXIS 129066, at *8 n.2 (E.D. Mich. Sep. 11, 2012).   In any event, Shaya's affidavit at most demonstrates that Tertzag may have suspected his reporting activities, but suspicion alone is not enough to show that Tertzag knew about these reports and that this knowledge motivated his alleged conduct.

Finally, Shaya contends that Tertzag "learned . . . that I had informed City Council of ethnic profiling accusations involving code enforcement personnel" during a September 2012 meeting where Tertzag stripped him of his code enforcement powers. [122, Ex. 1 at ¶ 26].   This statement is entirely belied by the record.   During his deposition, Shaya reiterated several times that Tertzag only took away his code enforcement responsibilities in February 2013 after they had already been *restored* to him in 2012. [112, Ex. W at 971-74].   Furthermore, Shaya does not reference the September 2012 meeting with Tertzag anywhere in his deposition testimony or in his second supplemental response to the City's interrogatories. [112, Ex. HH at 3447-52].   Inasmuch as Shaya's affidavit contradicts his earlier deposition testimony, the Court finds no reason to depart from the "well settled [precedent] that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition." *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 384 (6th Cir. 1991); *see also Lashbrook v. Portfolio Recovery Assocs., LLC*, No. 11-15624, 2013 U.S. Dist. LEXIS 123113, at *14-15 n.4 (E.D. Mich. Aug. 29, 2013).

31

permissibility of drawing an inference of causation from temporal proximity alone."); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [*sic*] of retaliation.").  In sum, because Shaya does not raise a genuine issue of material fact as to causation, his First Amendment retaliation claim cannot survive summary judgment.[16]

### 7.    Michigan State Constitutional Claims – Tertzag (Counts XV and XXIV)

Shaya alleges that the same conduct underlying his First Amendment retaliation claim against Tertzag also supports separate causes of action under Article I, Sections II (equal protection), III (assembly), V (free speech) and XVIII (self-incrimination, fair treatment at investigations) of the Michigan State Constitution. [48 at ¶ 165, 216].  For the reasons stated in the Court's discussion of Shaya's identical claim against Garbarino, *see supra* at 20, he may not seek damages against individual government employees under the Michigan State Constitution. *Jones*, 462 Mich. at 337.

---

[16] The Court need not consider Tertzag's alternative argument that he is entitled to qualified immunity as Shaya "failed to establish a prima facie case of a violation of a constitutional right . . ." *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010).

8.      *ELCRA Claim – Tungate (Count X)*

Shaya's ELCRA claim against Tungate has three components.  First, Shaya contends that, after he reported Tungate to City officials for selectively enforcing the City's building code against minority residents and denying them public services, Tungate retaliated against him by issuing him an unwarranted reprimand, placing him on a 90-day probation, and requiring him to verify his professional and educational qualifications.  Second, Shaya maintains that Tungate's retaliatory conduct also qualifies as illegal discrimination.  Third, Shaya alleges that Tungate engaged in public services discrimination against the City's minority residents.  [48 at ¶¶ 123-35].  None of these arguments are sufficient to withstand summary judgment.

With respect to the retaliation component of the ELCRA claim, even assuming Shaya engaged in a protected activity and that Tungate knew about it, *i.e.*, the first two elements of the claim, he still fails to show that the reprimand, the 90-day probationary period, and the verification of his employment credentials constitute an adverse employment action, *i.e.*, the third element.  As the Court has already observed, an adverse employment action is typically "akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Chen*, 284 Mich. App. at 202 (quotation omitted); *see also*, *Pena*, 255 Mich. App. At 311.  Here, Shaya testified that the reprimand Tungate issued was quickly removed from his personnel file after he hired an attorney, that the 90-day probationary period was temporary, and that Tungate placed him on probation in part because he had failed to provide the City with the educational and professional licensing information needed to verify his employment qualifications. [105, Ex. 2 at 198-99,

219].  Shaya also acknowledged that Tungate never terminated him, demoted him, altered his job responsibilities or reduced his compensation. [*Id.* at 219].  Since none of these acts materially impacted Shaya's employment status, benefits, or responsibilities, they are not cognizable adverse employment actions. *See Pender v. Olivet College Bd. of Trs.*, No. 273723, 2008 Mich. App. LEXIS 152, at *19 (Mich. Ct. App. Jan. 22, 2008) (holding that probation letter was an adverse employment action only because it eliminated plaintiff's "judicial board responsibilities"); *Morris v. Selectcare, Inc.*, No. 183483, 1996 Mich. App. LEXIS 2213, at *6-7 (Mich. Ct. App. Dec. 6, 1996) (holding that 90-day probationary period without evidence of demotion did not constitute an adverse employment action); *see also Anderson*, 2005 Mich. App. LEXIS 1896, at *7 (reprimand letter did not constitute a materially adverse employment action where "there was no consequence to or alteration of [plaintiff's] pay, status, or responsibilities."); *Briggs*, 2002 Mich. App. LEXIS 1199, at *4 (same).

Furthermore, to the extent Shaya contends that Tungate retaliated against him by implementing an "open-door policy" with the intention of undercutting his supervisory powers, Shaya provides no evidence that Tungate lacked the authority to implement such a policy, and he fails to identify any cases, statutes, or regulations that construe a supervisor's "open-door policy" as an adverse employment action. [105, Ex. 2 at 221].  In addition, Shaya's allegation that Tungate deprived him of his code enforcement powers does not amount to an adverse employment action because, as discussed above, he fails to demonstrate that he ever lawfully possessed such authority in the first place.  *See supra* at 23-24; Hamtramck, Mich., Mun. Code § 31.019(A).  Moreover, Shaya acknowledged at his deposition that city managers have the

34

discretionary authority to transfer DPS responsibilities to other City departments and agencies.

[112, Ex. U at 268].[17]

---

[17] Relying on *Meyer*, Shaya claims that Tungate retaliated against him by failing to remedy the harassment he received from DPS code enforcement officer Nathan Izydorek. In his affidavit, Shaya alleges that:

> 21. I told [Tungate] that Nathan Izydorek was harassing me by spreading false statements about me to employees at City Hall; the false statements included (A) that I had authorized unnecessary work, such as tree removal, in order to create more work for Platinum Landscaping, and (B) that I was engaged in an improper and illicit conflict of interest with respect to administering the city's contractual relationship with Platinum Landscaping.

> 22. Tungate made no attempt to remedy this co-worker harassment involving Izydorek, but actually included some of these false allegations as grounds for his 90-day probation reprimand.

> 23. Due to this lack of remedial action, Izydorek was not only re-hired but continued his employment for months in Hamtramck and also continued to spread the same false statements for months against met at City hall until Izydorek resigned, but only after he prepared a memo regarding many of these same false allegations, which caused me great emotional distress and embarrassment and were clearly harassing; I believe th[ese] harassing allegations were in retaliation for my report to City Council about ethnically discriminatory rendition of sidewalk replacement and tree trimming services as well as the Tungate directive to DPS to "go after [minority residents].

[121, ¶¶ 21-23 at Pg ID 3990-91]. The above conduct, however, is not "sufficiently severe" such that Tungate's "failure to take action to respond [constituted] a materially adverse change in the conditions of employment." *Meyer*, 242 Mich. App. at 571.

In this regard, *Johnson v. City of Flint*, No. 09-11805, 2010 U.S. Dist. LEXIS 47029 (E.D. Mich. May 13, 2010) is most directly on point. *Johnson* involved a City of Flint police officer alleging claims of sex discrimination and retaliation under federal law and the ECLRA. With respect to the ELCRA claim, the plaintiff asserted that her fellow officers retaliated against her by engaging in a pattern of co-worker harassment that exceeded the severity of Shaya's allegations, including:

(1) officers would remark that the Inspector's Unit, to which Plaintiff was assigned, would soon be nonexistent; (2) officers, who had a "close relationship with [an] Assistant United States Attorney," did not have to testify at a July 2008 Justice Bureau hearing, and the "relationship [was used] as visible apparent harassment towards" Plaintiff; (3) a lieutenant filed an incident report contending that members of the Inspector's Unit were violating department policy, when the lieutenant himself violated the same policy just a week later; (4) two sergeants, Hamilton and Hetherington, blamed Plaintiff for their reassignment within the department; (5) the union president and other officers "openly spoke against the Inspector['s]" Unit; (6) other officers would laugh and joke about Plaintiff when she walked by them; (7) an officer would not call off a stolen car chase at Plaintiff's request because "'we don't call off chases for an Inspector'"; (8) officers would block Plaintiff from "walking in and out of doors and elevators"; (9) an officer called her a "lesbian bitch," "tried to run into [her] in the … parking lot … while driving his personal vehicle … got out of his car looked at [her] and laughed," would glare at her in the hallways, and made other comments; (10) officers "put different memos in the union window box" speaking out against the Inspector's Unit; (11) an officer belched in Plaintiff's face and "looked at [her] while … driving … and laughed while grabbing his crotch and shaking it"; and (12) an officer "called the alarm company and had [her] … [access] card turned off," and also "had his sister go to the mayor's office [and to police mini-stations] and make numerous complaints about [Plaintiff] that were untrue."

*Id.* at *2 n.1. Citing to *Meyer*, the district court found that "[p]laintiff's claim for retaliatory harassment fails as she has not provided sufficient evidence that she suffered severe or pervasive levels of harassment." *Id.* at *37. The same ruling is warranted here. While Shaya maintains that Izydorek disseminated false allegations that he authorized unnecessary tree removal work to benefit a City contractor and that Shaya exhibited a conflict of interest with this same contractor on account of a familial connection, [*see* 112, Ex. H at Pg ID 2635], this "behavior . . . does not rise to the requisite level" of severity to be considered actionable. *Id.*; *see also Nelson v. Alger Maximum Correctional Facility*, Nos. 239224, 240230, 2003 Mich. App. LEXIS 1652, at *9 (Mich. Ct. App. Jul. 3, 2003) (holding that pattern of conduct was not sufficiently severe or pervasive where plaintiff's supervisor denied allegations of misconduct, the same supervisor "allegedly behaved with excessive belligerence in expressing displeasure at how plaintiff was performing a particular task, [plaintiff reported] two instances of unwelcome physical contact from the warden, and . . .plaintiff's likeness [was included] in a retirement present for the warden

36

The Court also finds the Tungate is entitled to summary judgment on Shaya's ELCRA discrimination claim because individuals who report ELCRA violations are not a protected class under this aspect of the statute.  As the Court already explained in its discussion of Shaya's identical claim against Tertzag, *see supra* at 27-28, individuals who report ELCRA violations are only protected from employment retaliation. Mich. Comp. Laws § 37.2701(a).  They do not become a protected class in their own right merely by alleging that the retaliatory conduct doubles as a separate form of unlawful "discrimination." *See* Mich. Comp. Laws § 37.2202(1)(a)-(b) (prohibiting employment discrimination on account of an individual's "religion, race, color, national origin, age, sex, height, weight, or marital status.").

Shaya's ELCRA claim that Tungate engaged in public services discrimination should likewise be dismissed.  Because Shaya contends that Tungate selectively targeted the City's minority residents for public services discrimination without alleging that he himself was a victim of such conduct, he lacks standing to bring this claim.  Article III of the United States Constitution "confines the power of the federal courts to adjudication of 'cases' or 'controversies.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (quoting *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997)).  "The requirement that a claimant have standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Bench Billboard Co. v. City of Covington, Kentucky*, 465 F. App'x 395, 397 (6th Cir. 2012) (citation omitted).  To satisfy this requirement, Shaya must

---

that featured a 'gallery' of employees who had implicated the warden in various adverse proceedings.").

37

demonstrate: "(1) [he] has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quotation omitted). In the event Shaya is unable to establish Article III standing, his claim must be dismissed for lack of subject matter jurisdiction. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007).

Shaya failed to produce any evidence that Tungate's conduct individually deprived *him* of the public services enumerated in his complaint, or any other City-provided service for that matter, on account of his national origin. Again, as noted above, Shaya solely contends that Tungate singled out the City's minority residents for public services discrimination, without alleging that he himself was a victim of such conduct. Thus, Shaya did not suffer the type of concrete and particularized harm contemplated by Article III. Accordingly, the Court lacks subject matter jurisdiction to entertain his ELCRA public services claim against Tungate on behalf of the City's minority residents.

### 9.  First Amendment Retaliation Claim (Count XI) – Tungate

Shaya maintains that Tungate's alleged retaliatory conduct under the ELCRA also constitutes First Amendment retaliation. For purposes of this claim, "[t]he term adverse action" i.e., the second prima facie element, has "traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Pardi v. County of Wayne*, No. 12-12063, 2013 U.S. Dist. LEXIS 35142, at *27 (E.D. Mich. Mar. 14, 2013) (quotation omitted). As the Court discussed above in its treatment of the ELCRA retaliation claim, Shaya fails to establish that Tungate subjected him to an adverse action that would deter a

person of ordinary firmness from continuing to engage in that conduct. *See Pardi*, 2013 U.S. Dist. LEXIS 35142, at *28 (holding that a single disciplinary "write-up" and threats of discharge "by themselves are not adverse actions."); *Currie v. Arthur*, No. 11-892, 2012 U.S. Dist. LEXIS 68000, at *31-32 (E.D. Va. May 15, 2012) ("It is doubtful that placement on probation and an unfavorable performance review constitute an adverse employment action" where "[t]here is no evidence that Plaintiff's review detrimentally altered the terms and conditions of his employment."); *Lickteig v. Dentice*, No. 05-045, 2005 U.S. Dist. LEXIS 14396, at *8 (W.D. Wis. Jul. 12, 2005) (holding that a verbal reprimand and extension of probationary period did not qualify as an adverse action).

Additionally, Shaya provides no evidence that Tungate lacked the power to implement an "open-door policy" with DPS employees and the Court again notes the omission of any authority considering such policies an adverse employment action.  Nor does Shaya demonstrate that the deprivation of his code enforcement powers amounted to an adverse action since he fails to show that he ever lawfully possessed such authority. *See* Hamtramck, Mich., Mun. Code § 31.019(A). In fact, as the Court noted earlier, Shaya acknowledged during his deposition that city managers have the discretionary authority to transfer DPS responsibilities to other City departments or agencies. [112, Ex. U at 268].  And, the HCO alludes to this arrangement since it permits the city manager to "assign other duties and responsibilities to the Department as necessary for the operation of the city." Hamtramck, Mich., Mun. Code § 31.019(C).  As a result, Shaya's First Amendment retaliation claim against Tungate should be dismissed.[18]

---

[18] Shaya alleges that Tungate harassed him by telling him on one occasion that, "I know how you Chaldeans operate." [121, ¶ 20 at Pg ID 3990].  Assuming this allegation is true, Tungate's

10.     *Michigan State Constitutional Claims (Count XII) - Tungate*

Shaya alleges that the same conduct underlying his First Amendment retaliation claim against Tungate also supports separate causes of action under Article I, Sections II (equal protection), III (assembly), V (free speech) and XVIII (self-incrimination, fair treatment at investigations) of the Michigan State Constitution. [48 at ¶ 165, 216]. For the reasons stated in the Court's discussion of Shaya's identical claims against the other defendants in this case, he may not seek damages against individual government employees under the Michigan State Constitution. *Jones*, 462 Mich. at 337. Thus, these claims fail as a matter of law.

11.     *Whistleblower Protection Act Claim (Count I) – Tardif and the City*

Shaya asserts that Tardif violated the WPA by: (1) fabricating his involvement in the hit-and-run accident; and (2) commencing a baseless investigation into the cause of the broken taillight on his City-owned vehicle after Shaya disclosed Tardif's alleged dual employment to City officials. [*Id.* at ¶¶ 76-84]. Shaya further maintains that the City is vicariously liable under the WPA because it failed to remedy Tardif's conduct.

The WPA provides, in pertinent part, that:

> [a]n employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report,

---

isolated remark does not qualify as an adverse employment action for purposes of First Amendment retaliation. *See Long v. Finch*, No. 14-13269, 2015 U.S. Dist. LEXIS 166851, at *8 (E.D. Mich. Jul. 24, 2015) *adopted by* 2015 U.S. Dist. LEXIS 49002 (E.D. Mich. Feb. 27, 2015) ("mere verbal harassment . . . does not amount to evidence of adverse action sufficient to establish a First Amendment retaliation claim"); *Hann v. Michigan*, No. 05-71374, 2007 U.S. Dist. LEXIS 27384, at *27 (E.D. Mich. Mar. 2, 2007) (same).

> verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body . . .

M.C.L. § 15.362. The statute defines the term "employer" as "a person who has 1 or more employees" and "includes an agent of an employer . . ." M.C.L. § 15.361(b). Analogizing to the ELCRA, Michigan courts have held that the "agent" of an employer is an individual "to whom an employing entity delegates supervisory power and authority to act on its behalf . . . as distinguished from co-employees, subordinates, or coworkers who do not have supervisory powers or authority . . ." *Glover v. Pontiac Hous. Comm'n*, No. 281737, 2008 Mich. App. LEXIS 2583, at *15 (Mich. Ct. App. Dec. 30, 2008) (quoting *Elezovic v. Bennett*, 274 Mich. App. 1, 10 (2007)).

In light of this standard, Tardif cannot be treated as the City's agent for purposes of Shaya's WPA claim. Throughout Shaya's employment, Tardif was a sergeant in the City's police department, an agency separate and apart from DPS, with an entirely independent chain of command. This division of authority is codified in the City's ordinances, which provides for a "Department of Public Services [that is] headed by the Director of Public Services," Hamtramck, Mich., Mun. Code § 31.019(A), and a separate "Police Department [that is] headed by a Police Chief, who shall be the commanding officer of the police force and be responsible for the enforcement of law and order." Hamtramck, Mich., Mun. Code § 33.003. Thus, Tardif's alleged conduct vis-à-vis Shaya is not subject to the WPA because Tardif never had "supervisory power and authority" over him or DPS, *Glover*, 2008 Mich. App. LEXIS 2583, at *15. And, because Tardif is not liable under Shaya's WPA theory, it follows that the City cannot be vicariously liable for Tardif's alleged conduct. *See Young v. CSL Plasma, Inc.*, No. 15-10080, 2016 U.S.

41

Dist. LEXIS 43199, at *20 (E.D. Mich. Mar. 31, 2016) (dismissing ELCRA claim against employer under respondeat superior theory because the conduct of individual employee did not violate the statute).

Moreover, even assuming Tardif's conduct fell within the reach of the WPA, Shaya's claim would still fail. Under the WPA, a plaintiff may use either direct or indirect evidence of retaliation to support his claim. Since Shaya relies upon indirect evidence of retaliation, the Court must follow Michigan law and employ the *McDonnell Douglas* burden-shifting framework to evaluate whether Shaya has raised a material question of fact as to whether "a causal link exists between" Shaya's reporting activities and Tardif's alleged conduct. *Debano-Griffin v. Lake County Bd. of Comm'rs*, 493 Mich. 167, 176 (2013).

The first step in this analysis requires the plaintiff to "present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful [retaliation]." *Id.* at 175 (quoting *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462 (2001)). A prima facie case of WPA retaliation consists of the following elements: "(1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Id.* (internal quotation marks omitted). Once the plaintiff satisfies this initial burden, "a presumption of [retaliation] arises because an employer's adverse action is more likely than not based on the consideration of impermissible factors . . . if the employer cannot otherwise justify the adverse employment action." *Id.* at 176 (citations and quotation marks omitted).

The employer must then come forward with legitimate reasons for the adverse employment action.  If at that time, "the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action," *id.*, the employer is entitled to summary judgment.  At this stage, in order to advance the case to trial, the plaintiff must produce evidence that not only "raise[s] a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful retaliation]." *Id.* (quoting *Hazle*, 464 Mich. at 465-66).

Shaya's WPA claim falters at the prima facie stage because he fails to marshal any admissible proof that Tardif actually knew about his reporting activities to City officials, *i.e.*, the element of causation.  The only purported "evidence" showing that Tardif knew about Shaya's disclosures is Shaya's own deposition testimony, where he alleged that Mileski had informed him that Tardif was aware of his reports to City officials. [112, Ex. W at 852].[19]  Since this portion of Shaya's testimony is not based upon personal knowledge, it cannot create a genuine issue of material fact. *See Bernard*, 2015 U.S. Dist. LEXIS 59108, at *18-19; *Flagg*, 827 F. Supp. at 775.  Consequently, Shaya's WPA claim against Tardif and the City should be dismissed.

---

[19] Mileski specifically denied ever having personal knowledge of Shaya's reporting activities, and further testified that he did not believe he knew anything about them before Shaya commenced this lawsuit because "this is the reason I know it specifically because I read in in the lawsuit."  [105-28 at 8-9].

12.     *Malicious Prosecution Claim (Count II) – Tardif, Mileski, and the City*

Shaya asserts that Tardif and Mileski are liable for malicious prosecution for filing the misdemeanor appearance ticket against him without probable cause. [48 at ¶¶ 85-91].  He also seeks to hold the City vicariously liable for the officers' alleged misconduct.

To establish a claim of malicious prosecution against a police officer under Michigan law, a plaintiff must show that: "(1) the officer knowingly and deliberately swore to false facts in a complaint, and (2) the officer's statements were material or necessary to the finding of probable cause." *Small v. Chirco*, No. 311728, 2014 Mich. App. LEXIS 47, at *7 (Mich. Ct. App. Jan. 14, 2014) (citing *Payton v. Detroit*, 211 Mich. App. 375, 395 (1995)).

Upon reviewing the record, the Court finds no admissible evidence that either Tardif or Mileski deliberately swore to any false information in the misdemeanor appearance ticket or their respective police reports.  In fact, Mileski indicated in his December 11, 2013 police report that he asked Judge Paruk to dismiss the misdemeanor charges against Shaya after he reviewed the audio file of Belcastro's 911 call and "came to the conclusion that there was to[o] many inconsistencies between the 911 tapes and the statements that were taken from the victim." [105, Ex. 35].

Shaya maintains that Tardif deliberately misrepresented his statements in the officer's November 18, 2013 police report.  Shaya alleges that, contrary to the facts contained in the report, he never told Tardif that he had remained at his DPS office throughout the day of the accident or that his City-owned vehicle "was parked in the rear of City Hall" that entire day. [*Id.*, Ex. 34; *see* 121, ¶ 38 at 4009].  Nonetheless, Shaya fails to show that he never made these statements, Tardif knowingly and deliberately falsified these statements, or that Tardif falsely

44

swore to the veracity of the factual allegations in his police report.  Moreover, while it appears that Tardif failed to mention in his report that Belcastro was unsure whether the driver of the vehicle that struck his car was African-American, or that Belcastro expressed some confusion as to whether he properly identified the vehicle involved in the accident as Shaya's City-owned Chevy Blazer, these omissions do not sufficiently demonstrate that Tardif knowingly and deliberately falsified his police report. [105, Ex. 23 at 97, 100].

As for the City's liability, it prevails for two reasons.  First, since neither Tardif nor Mileski are liable for the reasons stated above, the City cannot be vicariously liable for their alleged conduct.  *See Young,* 2016 U.S. Dist. LEXIS 43199, at *20.  Second, although the complaint does not draw the distinction between direct and vicarious theories of liability, since the officers "were engaged in activities related to the operation of the [C]ity's police force," the City is governmentally immune from suit. *Payton v. City of Detroit*, 211 Mich. App. 375, 393 (1995); *see also* Mich. Comp. Laws § 691.1407(1).  Thus, even assuming "the officers were not engaged in the exercise of a governmental function within the scope of their employment, the [C]ity is nonetheless entitled to immunity because it cannot be held liable for the intentional torts of its employees." *Payton*, 211 Mich. App. at 393 (citation omitted).  Therefore, Shaya's malicious prosecution claim against Tardif, Mileski, and the City should be dismissed.

### 13. *First Amendment Retaliation Claim (Count XVI) – Tardif and Mileski*

Shaya alleges that Tardif and Mileski engaged in First Amendment retaliation by, among other things, initiating the hit-and-run investigation and filing a false misdemeanor appearance ticket against him in retaliation for his reporting activities. [48 at ¶ 168-171].

45

Assuming Shaya engaged in a protected activity, and that Tardif's and Mileski's alleged conduct constitute an adverse action, Shaya still fails to rebut Tardif's and Mileski's deposition testimony that they never knew about his disclosures to City officials. [105, Ex. 23 at 64, 66, 157; Ex. 27 at 7]. Without any admissible evidence that Tardif and Mileski were "motivated at least in part" by Shaya's disclosures to City officials, *Kennedy*, 635 F.3d at 217, the First Amendment retaliation claim against them should be dismissed.

### 14.    *Michigan State Constitutional Claims (Count XVII) – Tardif and Mileski*

Shaya contends that the same conduct underlying his First Amendment retaliation claim against Tardif and Mileski also supports separate causes of action under Article I, Sections II (equal protection), III (assembly), V (free speech) and XVIII (self-incrimination, fair treatment at investigations) of the Michigan State Constitution. [48 at ¶ 173-75]. As the Court has explained above, however, Shaya may not recover damages against individual government employees for claimed violations of the Michigan State Constitution. *Jones*, 462 Mich. at 337. Thus, these claims should be dismissed.

### 15.    *Whistleblower Protection Act (Count XXV) – Karpinski and Mackiewicz*

Shaya contends that Karpinski and Mackiewicz retaliated against him after he reported Karpinski for water billing fraud to Emergency Manager Square by terminating the water service to his sister's residence. Shaya further alleges that the City is liable under the WPA because it failed to take disciplinary action against Karpinski and Mackiewicz. [48 at ¶¶ 218-22].

As a preliminary matter, Karpinski's and Mackiewicz's alleged conduct is not actionable under the WPA because neither of them were Shaya's employer nor agents of the City with respect to the supervision of his employment. *See Glover*, 2008 Mich. App. LEXIS 2583, at *15

46

("persons to whom an employing entity delegates supervisory power and authority to act on its behalf are agents, as distinguished from co-employees, subordinates, or coworkers who do not have supervisory powers or authority . . .").  Rather, since Shaya had direct authority over the Water Department, *see* Hamtramck, Mich., Mun. Code § 51.001 ("It is hereby made the duty of the Hamtramck Water Department, under the direction of the Director of Public Services, to enforce [the City's Public Water Service ordinances].")), both Karpinski and Mackiewicz were his subordinates.  As such, their alleged conduct cannot form the basis of Shaya's WPA claim against them or the City.  *Glover*, 2008 Mich. App. LEXIS 2583, at *15.

Moreover, even assuming the WPA applies, and that Shaya engaged in a protected activity by reporting Karpinski's alleged water billing fraud to Emergency Manager Square, there is no evidence that either Karpinski or Mackiewicz took any adverse action against him. At his deposition, Shaya admitted that he was unaware of any Water Department work orders directing the water service termination at his sister's residence, and there is nothing in the record indicating that Karpinski ordered such a termination or that Mackiewicz carried out any directives on Karpinski's behalf. [105, Ex. 2 at 92-95].

Similarly, as to causation, Shaya failed to demonstrate that Karpinski knew that he had reported her alleged water-billing fraud to Emergency Manager Square.  And Square herself testified that Karpinski was never informed of Shaya's reporting activities.[20] [*Id.* at 122].

---

[20] Although Shaya maintains that Mackiewicz "indicated that she suspected that I likely had initiated the investigation of Cheryl Karpinski that led to Karpinski's suspension," [111, ¶ 7 at Pg ID 2227], he does not explain what the word "indicated" means.  This vague term leaves open the question of whether Shaya's statement is based upon his own personal knowledge or whether Mackiewicz's alleged suspicions were related to him by someone else.  As a result, this portion of Shaya's affidavit is "ultimately inadmissible at trial as lacking in foundation and, therefore,

Finally, Shaya admitted that his sister's residence had an unpaid water bill balance, and he has not shown that such delinquency was not a legitimate basis for any water service termination that occurred. [*Id.* at 94-95]. For all of these reasons, Shaya's allegations against Karpinski and Mackiewicz do not qualify for protection under the WPA.

### 16.   *§ 1983 Claim (Count V) – All Defendants*

Shaya alleges that the defendants conspired with one another to deprive him of equal protection and substantive due process under the Fourteenth Amendment by: (1) "committing acts of discrimination on account of national origin and religion"; (2) "acting with deliberate indifference after learning of ongoing acts of police harassment against Plaintiff including retaliation"; (3) "filing malicious and groundless criminal proceedings"; and (4) violating his right "to be free of harassing and retaliatory conduct due to his exercise of his constitutional rights and his national origin or religion." [48 at ¶ 104]. Shaya also maintains that the defendants formed a conspiracy to violate his Fourth Amendment "rights against unreasonable search and seizures." [*Id.*].

A plaintiff alleging a civil conspiracy under Section 1983 must show that: "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). Since direct evidence of a conspiracy is relatively uncommon, "it is enough

---

insufficient to" create a material question of fact that Mackiewicz either knew or suspected that Shaya reported Karpinski's alleged water-billing fraud to Emergency Manager Square. *Courtney*, 2012 U.S. Dist. LEXIS 129066, at *8 n.2.

to produce circumstantial evidence sufficient to reasonably infer the existence of a conspiracy." *Womack v. Conley*, 595 F. App'x 489, 494 (6th Cir. 2014).

Shaya's Section 1983 conspiracy claim lacks merit as he points to nothing in the record demonstrating that the defendants formulated a single plan and shared a conspiratorial objective to violate his constitutional rights. On the contrary, viewing the record in a light most favorable to Shaya, the defendants' conduct, taken as a whole, does not support an inference of conspiracy because it "is just as consistent with independent conduct as it is with a conspiracy." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012); *see also Womack*, 595 F. App'x at 494 (affirming the district court's dismissal of a Section 1983 conspiracy claim on the ground that the "circumstantial evidence [was] just as consistent with a legitimate police investigation as with a conspiracy"). Therefore, summary judgment on Shaya's Section 1983 conspiracy claim should be granted in favor of the defendants.[21]

---

[21] Although not raised in the parties' briefs, it appears that the intra-corporate conspiracy doctrine similarly bars Shaya's conspiracy claim under Section 1983. Under Sixth Circuit precedent, the intra-corporate conspiracy doctrine prevents a plaintiff from commencing a Section 1983 lawsuit against multiple defendants who work for the same governmental entity because "the defendants are members of the same collective entity, [and] there are not two separate 'people' to form a conspiracy." *Hull v. Cuyahoga Valley Joint Vocational School District Board of Education*, 926 F.2d 505, 510 (6th Cir. 1991). Since Shaya contends that the defendants – all of whom are City employees – engaged in a conspiracy to violate his constitutional rights, his Section 1983 claim is indistinguishable from those raised in numerous other cases throughout this circuit that have been dismissed under the intra-corporate conspiracy doctrine. *See e.g.*, *Upton v. City of Royal Oak*, 492 F. App'x 492, 506-07 (6th Cir. 2012); *Pardi*, 2013 U.S. Dist. LEXIS 35142, at *44-45 (dismissing Section 1983 claim of conspiracy under the intra-corporate conspiracy doctrine, where all of the individual defendants were either employees or agents of the same county); *Mauldin v. Napolitano*, No. 12-10114, 2012 U.S. Dist. LEXIS 96772, at *14-15 (E.D. Mich. Jul. 12, 2012) (relying upon the intra-corporate conspiracy doctrine to dismiss a conspiracy claim solely against employees of the Department of Homeland Security).

17.     *ELCRA Claim (Count VI) – The City*

Shaya asserts that the City should be held vicariously liable for the same conduct underlying his ELCRA claims against Garbarino, Tertzag, and Tungate. [48 at ¶ 108]. This contention is unavailing because the Court has already explained why Shaya failed to raise a material question of fact that these defendants violated the ELCRA, and the City "cannot be held liable if the agent having primary responsibility is not liable." *Young*, 2016 U.S. Dist. LEXIS 43199, at *20 (quoting *Lincoln v. Gupta*, 142 Mich. App. 615, 622 (1985))..

Shaya also argues that the City should be held vicariously liable for the conduct of City parking enforcement officer Christine Akins. Shaya alleges that, in January 2014, Akins told him, "you are too busy with your sand meetings." [48 at ¶ 70(C); 112, Ex. U at 104]. This incident was followed by another verbal exchange in February 2014, where Akins supposedly told Shaya, "you park like an Arab." [112, Ex. U at 105]. Although reprehensible, neither of these isolated remarks, if actually made, qualifies as harassment under the ELCRA because they are not "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Handlon*,, 2012 U.S. Dist. LEXIS 15359, at *24 (holding that two incidents where co-worker inquired about the race of plaintiff's children and another where co-worker called plaintiff "ghetto" did not establish a racially hostile work environment); *see also Mayville*, 2006 Mich. App. LEXIS 3226, at *10-11 (upholding the dismissal of ELCRA racial harassment claim where supervisor called plaintiff a "white bitch"). For these reasons, Shaya fails to demonstrate that the City is vicariously liable under the ELCRA.

18.     *IIED Claim (Count VII) – All Defendants*

Shaya maintains that "each Defendant has committed intentional and outrageous acts targeted to deny Plaintiff his constitutional rights and were calculated to induce severe emotional mental and physical trauma to Plaintiff . . ." [48 at ¶ 111].   However, the Court has already explained throughout this Report and Recommendation why the allegations on which Shaya bases his IIED claim fail to rise to the level he perceives them to be.   He has simply failed to show conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Smith*, 233 Mich. App. at 113 (quoting *Haverbush*, 217 Mich. App. at 234). Rather, he has alleged at most "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" which are not enough to support an IIED claim.   *Roberts*, 422 Mich. at 603 (quoting Restatement Torts, 2d, § 46, comment d, pp. 72-73); *see also Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993).   Accordingly, this claim should be dismissed.


**III.     CONCLUSION**

For the foregoing reasons, **IT IS RECOMMENDED** that the defendants' motions for summary judgment **[103, 104, 105]** be **GRANTED**.


Dated: June 10, 2016                              s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge

51

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  **Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review**; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).  A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).

Each objection must be labeled as "Objection #1," "Objection #2," etc., and **must specify precisely the provision of this Report and Recommendation to which it pertains**.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 10, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
